IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PNC MORTGAGE                              :
(A DIVISION OF PNC BANK, N.A.)            :
                                          :        CIVIL ACTION
            v.                            :
                                          :        NO. 09-5084
SUPERIOR MORTGAGE                         :
CORPORATION, ET AL.                       :

## MEMORANDUM

**SURRICK, J.**                                        **FEBRUARY  27 , 2012**

Presently before the Court are Defendant John H. Coneys' Motion for Summary

Judgment (ECF No. 63), Defendant Superior Mortgage Corporation's Motion for Partial

Summary Judgment (ECF No. 65), and Defendant Marc Pollicino's Motion for Partial Summary

Judgment (ECF No. 66).  For the following reasons, Defendants' Motions are each denied.

## I.    BACKGROUND[1]

In this unfair competition action between two mortgage companies, Plaintiff National City

Mortgage ("National City"), now PNC Mortgage ("PNC") as a result of a merger between

National City and PNC in late 2008,[2] brings numerous claims against Defendants Superior

Mortgage Corporation ("Superior"), John Coneys and Marc Pollicino, as a result of the departure

of the individual defendants from National City to Superior.  Coneys and Pollicino, who were

---

[1] We view of all of the facts and draw all reasonable inferences therefrom in the light
most favorable to Plaintiff, the non-moving party.  *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848,
852 (3d Cir. 2006).

[2] PNC Mortgage is the named Plaintiff in this action.  Prior to our August 1, 2009 order
granting Plaintiff's Uncontested Motion to Amend the Caption (Order, ECF No. 59), National
City Mortgage Company was the named Plaintiff.

former branch managers for the Plymouth Meeting, Pennsylvania, and Marlton, New Jersey branches of National City, brought with them to Superior many of National City's loan officers and other staff members, customer lists they had generated during their employment at National City and other loan documents and files.  Plaintiff alleges, among other things, that Coneys and Pollicino breached their employment agreements with National City, misappropriated confidential information, including customer lists, and orchestrated a mass exodus of employees from the Marlton and Plymouth Meeting branches to Superior, ultimately resulting in the closing of those branches.  Plaintiff also brings numerous claims against Superior for its role in the alleged unfair competition scheme, including misappropriation of trade secrets, conversion, tortious interference with contract and unfair competition.

### A.    PNC Mortgage

PNC is a successor by merger to National City.  National City, a division of National City Bank, was a full service mortgage company based in Ohio.  (Compl. ¶ 2, ECF No. 1.)  National City's operations included originating, processing, underwriting and closing of mortgage loans. (*Id.*)  In October 2008, National City and PNC Bank, N.A. announced that PNC Bank would purchase National City.  (Defs.' Joint Statement of Facts [hereinafter referred to as "Defs.' Joint Stmt."] Ex. E at ¶ 1, ECF No. 69 (filed under seal).)  The merger was completed on December 31, 2008.  (*Id.* at ¶ 2.)

After the merger, Plaintiff had four geographic divisions:  the Eastern, Western, Central and Midwest divisions.  (Pl.'s App. Ex. 88, ECF No. 81 (filed under seal).)  The Marlton and Plymouth Meeting branches were located in the Eastern Division.  (*Id.*)  Pollicino was the

manager of the Marlton branch. (Pollicino Dep. 19-20, Defs.' Joint Stmt. Ex. D.)[3] Prior to July 1, 2009, there were approximately nineteen people employed at the Marlton branch office: Pollicino, eight loan officers and ten support staff. (Compl. ¶ 10.) Coneys was the manager of the Plymouth Meeting branch. (Coneys Dep. 27-28, Defs' Joint Stmt. Ex. C.) The Plymouth Meeting branch employed approximately twenty-three people: Coneys, ten loan officers and twelve support staff. (Compl. ¶ 9.)

Loan officers were responsible for soliciting and originating single-family mortgage loans. (Pl.'s App. Ex. 24 at § II.A.) Branch managers, including Pollicino and Coneys, were responsible for supervising the loan officers, managing operations, and bringing business into their respective branch offices. (Compl. ¶¶ 9-10.) In addition to a base salary, branch managers were paid commissions on the loans they originated, and ten percent of the branches' profits. (Pl.'s App. Exs. 62 & 70.) Loan officers acquired many of their customers by way of referrals from realtors, and other sources. (Huddell Dep. 31-32, Pl.'s App. Ex. 14.) Loan officers were paid a base salary in addition to commissions they received on the loans they originated. (Pl.'s App. Exs. 24 & 70.) National City, and after the merger, PNC, helped to pay for programs that assisted the branch managers and loan officers in developing relationships with referral sources and customers. These programs included desk rental and marketing agreements with realtors; programs where third party vendors would send marketing materials to referral sources and customers; and other marketing products. (Ailes Dep. 29-31, Pl.'s App. Ex. 5; Pl.'s App. Ex. 3

---

[3] Defendants submitted a Joint Statement of Facts in support of their separate Motions for Summary Judgment. The Appendix of Exhibits attached to the Joint Statement of Facts is relied upon by all Defendants. Defendant Coneys' filed an additional Appendix in Support of Summary Judgment. (Coneys App., ECF No. 70 (filed under seal).)

at 14-16; Pollicino Dep. 53-65; Moran Dep. 42-43, Pl.'s App. Ex. 18.)  In addition, Plaintiff employed and paid the salaries of marketing assistants, who prepared and sent marketing materials to customers and referrals on behalf of loan officers and branch managers.  (Pl.'s App. Ex. 3 at 15.)  Tara Moran provided marketing assistance at the Marlton branch, and Katherine Wynne provided marketing assistance at the Plymouth Meeting branch.  (Wynne Dep. 32, Pl.'s App. Ex. 23; Moran Dep. 36-37.)

### B.    Pollicino and the Marlton Branch

Pollicino was hired by National City as a branch manager in September 1998.  (Pollicino Dep. 18.)  Prior to commencing his employment, Pollicino received an offer letter dated August 12, 1998.  (Pollicino Dep. Ex. 359.)  The offer letter set forth a proposed compensation package and states that "[i]f you find the terms outlined herein acceptable, please acknowledge below and return a signed copy to this office.  (*Id.*)  Pollicino signed the offer letter on August 18, 1998. (*Id.*)  The offer letter states that "[s]hould you accept this employment, it is understood for a period of six months that you will not solicit or cause to be solicited any current National City employee should you subsequently terminate your employment with National City Mortgage for any reason."  (*Id.*)

In September 1998, Pollicino entered into an employment agreement with National City, entitled the "Loan Officer Compensation Agreement."  (Pollicino Dep. at Ex. 358.)  Pollicino's employment agreement attaches various addenda, including addenda relating to his commission and compensation structure.  (*Id.*)  Sections II and III of Pollicino's employment agreement, which relate to his compensation schedule, refer to the addenda attached to the agreement.  (*Id.* at §§ II & III.)  Section VI of the Agreement provides that "[y]ou acknowledge that proprietary

information, whether written or otherwise, from any previous employer will not be brought to

National City Mortgage." (*Id.* at § VI.)[4]  Section VII, entitled "Proprietary and Confidential

Information," provides:

> You understand that during the course of your employment with National City Mortgage you will be given access to confidential and proprietary information and trade secrets of National City Mortgage ("Confidential Information") including, but not limited to, mortgage loans, mortgage loan applications, customers, customer lists, customer files, mortgage loan pipeline reports, sales manuals, policy and procedure manuals, and other internal reports, data, information, and documentation. You agree that you will not disclose and will not reproduce or produce any compilations of Confidential Information.  In the event of the termination of your employment, you will immediately deliver to National City Mortgage all Confidential Information (including all copies) within your possession or control.

> You acknowledge that in the event you use or disclose Confidential Information in breach of this Agreement, National City Mortgage will suffer substantial and irreparable harm . . . .  Your obligations under this Section VII shall survive termination of your employment with National City Mortgage for any reason.

> The confidentiality provisions of this Loan Officer Compensation Agreement are in addition to any other National City Mortgage corporate, departmental, or branch office confidentiality and security policies and procedures.

(*Id.* at § VII.)  Section VIII, entitled "Regulated Activity," provides that:

> During the course of your employment with National City Mortgage, you may not render services to any other business or person without National City Mortgage's prior written consent.  With respect to your activities in originating loans within the scope of your employment, National City Mortgage is responsible for and must be in control of your actions.

(*Id.* at § VIII.)  Section IX, entitled "Miscellaneous Information," provides that:

> This Agreement addresses policies and procedures with respect to the payment of commission income and certain other related information.  In addition to this Loan Officer Compensation Agreement, you also should be aware that your employment

---

[4] Joseph Cartellone testified that Plaintiff had a policy of forbidding employees to bring customer lists from their former employers so long as they were under restrictions from their former employers.  (Cartellone Dep. 21, Defs.' Joint Stmt. Ex. G.)

at National City Mortgage is also governed by all branch, departmental, and National City Mortgage policies and procedures including, but not limited to, the **National City Corporation Employee Handbook**.

National City may in its sole discretion, revise this **Loan Officer Compensation Agreement**, including the commission structure outlined above and any other addenda, upon two weeks advance notice.

(*Id.* at § IX.)

Pollicino maintained a database of his customers using a database called Mortgage Quest. (Moran Dep. 36.)  Pollicino testified that he brought a Mortgage Quest customer list from his previous employer, and with the assistance of National City's IT Department, loaded the list he generated at his previous job onto his National City laptop.  (Pollicino Dep. 97-99.)  Pollicino's assistant, Tara Moran, would send loans to Pollicino, and Pollicino would upload the information into his Mortgage Quest database.  (Moran Dep. 38.)  Moran and Pollicino would send marketing materials using the information in the database.  (*Id.*)  Moran also maintained a Microsoft Outlook spreadsheet for Pollicino, and would add contact information for his customers and realtors in bulk every several months.  (Moran Dep. 44-45, Def.'s Joint Stmt Ex. I.)

C.       **Coneys and the Plymouth Meeting Branch**

Coneys was the branch manager for the Plymouth Meeting office until his resignation on July 29, 2009.  Coneys entered into an employment agreement, entitled the "Loan Officer Compensation Agreement," with National City on March 2, 2007.  (Pl.'s App. Ex. 70.)  Like Pollicino's employment agreement, Coneys' agreement attached various addenda, including addenda related to his commission and compensation structure.  Each addendum was separately signed by Coneys.  Section III of Coney's employment agreement is entitled "Base Salary, Commissions, and Related Compensation" and provides that base salary will be paid as provided

6

in Addendum I and that commissions will be paid as provided for in Addendum III.  (*Id.* at § III.)

Section VI provides that "[y]ou acknowledge that proprietary information, whether written or otherwise, from any previous employer will not be brought to National City Mortgage. (*Id.* at § VI.)  Section VII, entitled "Proprietary and Confidential Information," contains the same provisions prohibiting disclosure, reproduction or production of confidential information, as was contained in Pollicino's employment agreement.  (*Id.* at § VII.)  Section IX provides that:

> This Agreement addresses policies and procedures with respect to the payment of commission income and certain other related information.  Your employment at National City Mortgage is also governed by all branch, departmental, and National City Mortgage policies and procedures including, but not limited to the *National City Corporation Employee Handbook*.
>
> National City may in its sole discretion, revise this Agreement, including the commission structure outlined above and any other addenda, upon two weeks advance notice.  Any changes to this Agreement or to any policies or procedures may be made by any method customarily used to communicate at National City Mortgage.
>
> . . .
>
> During your employment with National City Mortgage, and for a period of six (6) months thereafter, you agree to not solicit any National City Mortgage employee to leave his or her position with any National City Corporation affiliate.
>
> This Agreement shall be governed by the laws of the State of Ohio, not withstanding that you are or may become a resident of a different state.

(*Id.* at § IX.)

In the Plymouth Meeting branch, Wynne and her assistant, Heather Robertson, performed marketing services for Coneys and the loan officers.  (Wynne Dep. 32, Pl.'s App. Ex. 23; Robertson Dep. 14-15, Pl.'s App. Ex. 21.)  Loan officers would enter information from their loan documents into a computer program called BYTE.  (Robertson Dep. 24-25.)  Robertson and Wynne would assist the loan officers with transferring the information from BYTE into an ACT

database.  (Robertson Dep. 24-30; Wynne Dep. 37-39.)  An ACT database was a database

generated using the ACT software package.  ACT databases were stored on each loan officer's

laptop, and copies were saved onto Wynne and Robertson's laptops.  (Wynne Dep. 38-39.)  An

ACT database collected customer information, including a customer's name, address, telephone

number, employment information, Social Security number, date of birth, loan amount, loan date,

interest rate and other loan information.  (Pl.'s App. Ex. 53.)  Wynne and Robertson generated

marketing materials using the ACT database such as birthday and holiday cards, thank you

letters, refinancing letters, flyers and other marketing mailers.  (Robertson Dep. 22-23, 36;

Wynne Dep. 32, 47.)  Marketing assistants also used the ACT database to generate lists of

customers for specified purposes, such as customers eligible for refinancing.  (Robertson Dep.

36-37; Pl.'s App. Ex. 52.)  Each quarter, backup CDs were made of the ACT databases.  (Wynne

Dep. 207.)

### D.     Plaintiff's Policy on Protection of Confidential Information

In addition to the provisions for confidential information contained in National City's

employment agreements, National City's Employee Handbook contained a section on employee

obligations with respect to confidential information.  (Pl.'s App. Ex. 31 at 2).  The confidentiality

provision contained in the 2007 Employee Handbook states:

> Nonpublic information regarding National City or its business, employees, customers
> and suppliers is confidential.  As a National City employee, officer or director, you
> are trusted with confidential information.  You are to use such confidential
> information only for the business purpose intended.  You are not to share confidential
> information with anyone outside of National City, including family and friends, or
> with other employees who do not need the information to carry out their duties.  You
> may be required to sign a confidentiality agreement in the course of your employment
> at National City.  You remain under an obligation to keep all information confidential
> even if your employment with National City ends.

The following is a non-exclusive list of confidential information:

(i) Trade secrets, which include any business or technical information, such as formula, program, method, technique, compilation or information that is valuable because it is generally not known.

. . .

(iii) Proprietary information such as customer lists and customer's confidential information.

(*Id.* at 5-6.)

National City employees are required to sign an Employee Handbook Receipt, which states that "I have read the Ethics Policy in the Employee Handbook and must comply with the provisions of that policy." (Pl.'s App. Ex. 91.) Coneys signed an Employee Handbook Receipt on July 17, 2007. (*Id.*) In addition, National City's Security Policy Manual prohibits employees from emailing proprietary and confidential information for use on computers not owned by National City. (Pl.'s App. Ex. 29 at § 4.f.) National City's employment agreements explicitly provide that employment is "governed by all branch, departmental, and National City Mortgage policies and procedures including, but not limited to the *National City Corporation Employee Handbook*." (Pl.'s App. Ex. 70 at § IX; Pl.'s App. Ex. 62 at § IX.)

In September 2008, Joseph Cartellone sent a memorandum to all mortgage employees, which addressed their obligations regarding protecting confidential customer and business information. (Pl.'s App. Ex. 46.) The memorandum states that "[e]very National City employee, including those with National City Mortgage, is obligated to maintain the strict confidentiality of all customer and business information," and refers to the confidentiality provisions contained in the Code of Ethics section of the Employee Handbook. (*Id.*) The memorandum provides examples of prohibited conduct, such as "downloading, copying or otherwise duplicating

9

confidential information or other proprietary National City property with the intent to use it to solicit the business of those customers for either himself/herself or for the benefit of third parties." (*Id.* at 2.) The memorandum further provides that it is a violation of policy "to remove from National City at your termination any confidential customer information with the intent to use it to solicit the business of those customers for the benefit of anyone other than National City." (*Id.*) Coneys and Pollicino were aware of the policy that upon termination or resignation from National City, employees were required to return their company-issued laptops and other property in their possession to National City. (Coneys Dep. 138-39, Pl.'s App. Ex. 10; Pollicino Dep. 125-26.)

In June of 2009, Plaintiff announced to all branch managers and loan officers that it was modifying its policy with respect to the use of electronic storage devices for creating backup copies of information stored on company laptops. (Pl.'s App. Ex. 40.) The modified policy prohibits the use of portable devices such as flash drives and CDs for backing up applications, system data and customer information, and directs that such information instead be saved to the company network shared drive. (*Id.*)

### E.    Reorganization of the Mortgage Division

In mid-2009, Plaintiff began to implement organizational changes to the mortgage division, including (1) centralizing the processing and underwriting functions, (2) modifying the compensation structure for loan officers and branch managers, including eliminating the ability of branch managers to earn commissions on loans they originate, and (3) raising the lending requirement thresholds for Federal Housing Authority ("FHA") loan products. (Cartellone Dep. 134-138.)

Prior to the centralization, National City's loan processing and underwriting functions were conducted at ninety-two sites, typically the branch offices.  (Devlin Dep. 97-98, Pl.'s App. Ex. 12.)  These functions were performed at both the Marlton and Plymouth Meeting branches. (Carr Dep. 19, Defs.' Joint Stmt. Ex. F.)  After centralization, the loan processing and underwriting functions were performed in only two locations – Pittsburgh and Chicago – thereby eliminating the need for these functions in the branch offices.  (*See* Cartellone Dep. 73; Naqvi Dep. 71-73, Pl.'s App. Ex. 19.)  The Eastern Division felt the greatest impact of the decentralization.  (Cartellone Dep. 102.)  Loan officers and branch managers did not favor the decentralized model because they felt they lost control over the process.  (Cartellone Dep. 102; Naqvi Dep. 172-73; Carr Dep. 36-37.)

Another change implemented after the merger was to alter the compensation structure for loan officers and branch managers.  On July 1, 2009, the Mortgage Division Origination Incentive Plan ("Incentive Plan") became effective.  (Pl.'s App. Ex. 86.)  The Incentive Plan sets forth, among other things, a revised compensation structure for loan officers and branch managers.  (*Id.*)  Section 8.5 of the Incentive Plan was entitled "Complete Plan" and stated that "[t]his plan and all of its attachments supersede all previous performance-based incentive programs applicable to the Participant and all prior incentive plans, agreements and understandings, written or oral are replaced by this Plan and are no longer of any force and effect."  (*Id.* at § 8.5.)

Prior to implementation of the Incentive Plan, branch managers, including Coneys and Pollicino, were paid a base salary, commission of the loans they personally originated, and a percentage of the profits generated by their respective branch offices.  (Defs.' Joint Stmt. ¶ 27;

11

Pl.s' Resp. to Joint Stmt. ¶ 27, ECF No. 79 (filed under seal).)  Under the Incentive Plan, branch

managers would no longer receive a commission on the loans that they originated.  (Pl.'s App.

Ex. 86; Carr Dep. 48.)  Pollicino and Coneys were not in favor of the new compensation

structure.  (Pollicino Dep 161-66, Defs.' Joint Stmt. Ex. D; Carr Dep. 50.)  The Incentive Plan

also affected loan officers because it decreased the commission rates for internal refinance loans

by 15 basis points.  (Tavarozzi Dep. 207-08, Defs.' Joint Stmt. Ex. H.)

Another change that occurred during the post-merger reorganization was the threshold

requirements for PHA loans.  The changes would impact less than five percent of the mortgage

loan production for the loan officers.  (Naqvi Dep. 218-19.)

F.      **Employee Attrition after Restructuring**

The parties dispute the attrition rate of branch managers and loan officers during and after

the reorganization in mid-2009.  The parties also dispute the cause of attrition during this time

period.  Defendants argue that the attrition rate was high and was a direct result of overall

employee dissatisfaction with the organizational changes announced and implemented in mid-

2009.  Plaintiff asserts that the attrition rate was not high compared to prior years, and that the

actual attrition rate of the Marlton and Plymouth Meeting branches was high compared to the

attrition rate of the Eastern Division as a whole.

At the time that the reorganization was contemplated, there were no plans to lay off loan

officers, nor plans to close the Marlton or Plymouth Meeting branch offices.  (Cartellone Dep.

200-01, Pl.s App. Ex. 9; Devlin Dep. 259, Pl.'s App. Ex. 12; Naqvi Dep. 156, Pl.'s App. Ex. 19.)

PNC anticipated that managers would leave as a result of the changes.  (Devlin Dep. 125.)  In

early April 2009, PNC contemplated various attrition assumptions that would result from the

sales reorganization and operations consolidation.  (Devlin Dep. Exs. 83 & 84.)  At first, PNC

forecasted a forty percent attrition rate.  (Devlin Dep. Ex. 83 at 3.)  Senior management officers

predicted higher numbers.  (See Cartellone Dep. 135 (predicting an attrition rate in the Eastern

Division to be sixty percent or higher); Devlin Dep 214 (predicting a one-third to two-third

attrition rate in the Eastern Division).)

On January 1, 2009, there were 499 loan originators in the Eastern Division.  (Pl.'s App.

Ex. 109.)[5]  By August 31, 2009, 184 of them had resigned or were terminated.  (*Id.*)  This

represents a thirty-seven percent attrition rate.  (*Id.*)[6]  Between August 31, 2009 and December

31, 2009, at least an additional 161 loan originators resigned or were terminated.  (Defs.' Reply

Ex. K.)  Cartellone testified that typical loan officer attrition is about forty to fifty percent per

year for all lenders.  (Cartellone Dep. 136.)

As of August 7, 2009, in the Eastern Division, a total of sixteen branch managers had

resigned, including Coneys; two branches other than Plymouth Meeting and Marlton had closed;

and a number of loan officers had resigned, including some in Marlton.  (Devlin Dep. Ex. 89.)

Gerald Devlin, Senior Vice President of the Eastern Division, testified that he felt as though the

attrition in the Eastern Division was higher than what PNC had expected.  (Devlin Dep. 213 ("I

think it was in excess and faster than even I had projected . . . .").)  Devlin testified based upon

an organizational chart, that of the approximately fifty-five managers in the Eastern Division that

_____

[5] Originators include branch managers, loan officers, loan officers assistants and
marketing assistants.  (Pl.'s Resp. 35 n.129.)

[6] Plaintiff claims that because the centralization of processing and underwriting and the
changes to the compensation structure were not announced to employees until May 2009, the
attrition rate during the first four months of 2009 would not be relevant for determining the
actual attrition caused by the changes implemented by PNC.

were employed around April through July of 2009, approximately forty-four had resigned as of January 2010, including himself.  (Devlin Dep. 215-17 & Ex. 91.)

G.      Superior Mortgage

Superior is a licensed, independent mortgage banker that specializes in residential mortgage lending, construction loans and refinance loans.  Superior was founded in 1997 by its then CEO, Stephen Cors and is currently headquartered in Hammonton, New Jersey.[7]  As of September 2011, Superior had approximately thirty branch offices, most of which were located in the mid-Atlantic region.  (Cors Dep. 11-13, Pl.'s App. Ex. 11.)

Superior's standard employment agreement prohibits employees from reproducing, or divulging to third parties, Superior's "confidential information," which includes customers' names, addresses, Social Security numbers, assets and income.  (Pl.'s App. Exs. 33 & 34.)  When hired by Superior, employees were required to sign an acknowledgment form, entitled "Representations of New Hire."  (Pl.'s App. Ex. 69.)  By signing the acknowledgment, the employee swore that before terminating employment with their former employer:  (1) they returned all confidential and proprietary information, including names and address of customers to their former employer; (2) they did not remove, without their former employer's consent, any "client files, client lists, loan applications, loans in progress, or computer data or any other proprietary information" from their former employer; (3) they performed no services for Superior; (4) they did not solicit customers of their former employer; and (5) they did not solicit their co-workers to leave their employment to join Superior.  (*Id.*)  Pollicino signed the

---

[7] We have been advised that Superior recently sold all of its assets to another company. The details of that sale have not been made available to the Court.

acknowledgment on August 17, 2009.  (*Id.*)

### H.   The Move to Superior by Pollicino and Marlton Branch Employees

Pollicino resigned from Plaintiff on August 19, 2009.  (Pl.'s App. Ex. 90.)  Two months prior to his resignation, he began to have discussions with Superior about his possible transfer to Superior.[8]  On June 15, 2009, Pollicino met with George Allen, Superior's Executive Vice President of Business Development.  (Pl.'s App. Ex. 65.)  Pollicino sent a follow-up email to Allen the next day, thanking him for the meeting and requesting that Allen let him know "whether we are a good fit."  (*Id.*)  Allen responded the same day stating that after discussing with Superior's Senior Management, "it sounds very positive" and he would be in touch to discuss "the next move."  Allen asked Pollicino whether he was "asking for the whole group or just yours."  Pollicino responded that "there is a good bit of production I have here with this entire group" and that he would "like to get this worked on ASAP."  (*Id.*)

On June 26, 2009, Pollicino sent an email to Allen, requesting that Allen send him employment agreements for Pollicino's loan officers.  (*See* Pl.'s App. Ex. 36 ("As we discussed yesterday, I will need LO [loan officer] agreements as well as my agreement.").)  Pollicino states in the email that "[he] hope[s] to hear from the individual that will serve as a contact for my loan officers."  (*Id.*)  On July 2, 2009, Pollicino instructed Superior's Human Resources Coordinator, Danielle Quintvalle:  "Please send me what ever [sic] is sent to my loan officers first.  I just want to make sure they don't receive anything I haven't discussed with them in advance."  (Pl.'s App. Ex. 41.)

---

[8]  Pollicino was interviewed by PNC human resources investigators on August 19, 2009, and told them he had not accepted employment with Superior.  (Pl.'s App. Ex. 105.)

On July 8, 2009, Superior held a training session for loan officers from the Marlton and Plymouth Meeting branches.  (Pl.'s App. Exs. 35 & 42.)  Allen described the training to Pollicino:  "This is the [loan officer] training for the two National City Branches coming on." (Pl.'s App. Ex. 35.)  By the end of July, at least seven of the employees from the Marlton branch, including Moran, had resigned from Plaintiff and taken up employment with Superior.  (Pl.'s App. Exs. 43 & 90.)  According to Superior's records, Pollicino began to work for them on July 17, 2009 (Pl.'s App. Ex. 43); however, he did not resign from Plaintiff until August 19, 2009 (Pollicino Dep. 291).  From July 17, 2009 until August 19, 2009, Pollicino was on the payroll for both Plaintiff and Superior.  Plaintiff closed its Marlton branch in October 2009.

### 1.     *Diversion of Loans to Superior*

In Pollicino's June 26, 2009 email to Allen, he asks Allen for guidance on the "loans that were not yet entered into Nat[ional] City's system" so that he can give direction to his loan officers.  (Pl.'s App. Ex. 36.)  On July 6 and 7, 2009, Pollicino asked Allen for assistance in approving loans for customers of one his loan officers, Dana Ailes, who, along with Pollicino, was still employed with Plaintiff.  (Ailes Dep. 156-59, Pl.'s App. Ex. 5; Pl.'s App. Exs. 37 & 38.)  Allen responded by asking whether these were loans that "Nat[ional] City can't or won't do" and whether the loans were in National City's system.  (Pl.'s App. Ex. 37.)  Pollicino responded that the loans were not "put into process" or entered into Plaintiff's system, but did not respond to Allen's question of whether National City cannot or will not process the loans. (*Id.*)

In a July 28, 2009 email to one of his loan officers, Pollicino states that "Mike Drummy [a Superior employee] is not the guy to give deals to anymore.  He was only put in place to

handle business while you were still with Nat[ional] City." (Pl.'s App. Ex. 56.) These loans were ultimately issued by Superior. (Pl.'s App. Exs. 75-77.) Pollicino himself signed loan applications for Superior while he was still employed with Plaintiff. (Pl.'s App. Ex. 103.)

Superior began to reach out to National City customers who thought they were obtaining a mortgage from National City. One customer sent Moran an email on July 8, 2009 to her National City email address. The email stated:

> I had a message on my voicemail from Mike at Superior Mortgage. He said he works with you and Marc and he was calling because he wanted to send out my loan paperwork to get the pre-approval started . . . . I was a little confused why someone would be calling from a different mortgage company when I wanted to go through National City. Please let me know as soon as you can.

(Pl.'s App. Ex. 59.) Once Moran began to work at Superior on July 14, 2009, she assisted Pollicino in closing loans at Superior even though Pollicino was still employed with Plaintiff. (*See* Pl.'s App. Ex. 55 (Moran stating to Allen: "I have a deal of Marc's that he needs an appraiser ordered on.").)

### 2.   Copying and Downloading of Customer Lists and Databases

When Moran began to work at Superior on July 14, 2009, she took her National City-issued laptop with her and had Superior's IT manager copy the information contained on it onto her computer at Superior. (Moran Dep. 151-52.) Pollicino was aware that Superior assisted Moran in copying her files onto her Superior laptop. (Pollicino Dep. 300-01.) Information for approximately 1,200 of Pollicino's customers was uploaded onto Superior computers. (Bennett Decl. ¶ 7, Pl.'s App. Ex. 113.)

### I.   The Move to Superior by Coneys and Plymouth Meeting Employees

Coneys resigned from Plaintiff on July 29, 2009. (Pl.'s App Ex. 74.) Discussions about

Coneys' move to Superior began as early as June 19, 2009, when Coneys met with Allen.  After the meeting, Coneys requested from Allen fifteen template loan officer compensation agreements, including benefits information.  (Pl.'s App. Ex. 71.)  On June 23, 2009, Allen sent Coneys the requested applications and benefit packages, and Coneys forwarded the information to all of his loan officers at their personal email addresses and copied Allen.  (Pl.'s App. Exs. 45 & 92.)[9]  The email reads:

> Hi all – it is time for round one – please see attached info and fill out ASAP - we cannot put loans with Superior until we are approved to come on board and we resign with Nat City – so we will talk about coordinating dates – probably the 1st round around 7/2 or 7/3 for those who want to.

(*Id.*)

On June 29, 2009, a representative from Superior met with Coneys and the loan officers in the Plymouth Meeting branch.  (Pl.'s App. Ex. 27; Allen Dep. 107-09.)  The loan officers were fingerprinted for their Pennsylvania loan officer licenses with Superior.  (*Id.*)  Neither Coneys nor the loan officers who participated in this meeting had yet resigned from Plaintiff.  (Pl.'s App. Exs. 74 & 90.)  Many of the loan officers in the Plymouth Meeting branch attended the Superior training session along with the Marlton branch loan officers on July 8, 2009.  (Pl.'s App. Exs. 35 & 42.)  Wynne, Coneys' assistant, reminded twelve of the loan officers in the Plymouth Meeting branch to bring their contracts with them to this training session.  (Pl.'s App. Ex. 42.)  At the

---

[9] Allen's email to Coneys stated:

> Here is the benefit information you can provide for your staff.  I'm also attaching the applications for employment and background checks.  Please have everyone complete and sign then fax back to me . . . .  Please fax from machines other than National City's.

(Pl.'s App. Ex. 92.)

time of the training session, neither Coneys nor any of his loan officers had resigned from

Plaintiff.  (Pl.'s Ex. 90.)  Coneys asked the loan officers to remain quiet about the decision to

move to Superior.  (Pl.'s App. Exs. 25 & 26.)

By the end of July, at least thirteen of the employees from the Plymouth Meeting branch,

including Coneys and Wynne, had resigned from Plaintiff and began employment with Superior.

(Pl.'s App. Exs. 43 & 90.)  Coneys began employment with Superior on July 22, 2009 (Pl.'s

App. Ex. 43); however, he did not resign from Plaintiff until July 24, 2009 (Pl.'s App. Ex. 74).

Cartellone testified that it sometimes happens that loan officers leave a branch when their branch

manager leaves.  (Cartellone Dep. 29.)  Cartellone further testified that he has seen scenarios,

which are "clearly lift-out scenarios," where the branch manager shops the team, finds a place to

transfer the team, and then waits to resign until after all of the loan officers move over.  (*Id.* at

197.)

### 1.    *Diversion of Loans to Superior*

Coneys' assistant, Wynne, summarized a conversation she had with Allen to Coneys in a

June 23, 2009 email.  The email stated, in relevant part:

> I can print our own blank application kits once I have access to them.
>
> . . .
>
> [Loan officers] may not originate any loans until they are resigned from NCM.  If
> [sic] has a loan to turn in before resignation, they must give only a handwritten 1003
> to Adam Waldman, the branch manager in [Superior's] Downingtown Branch to
> originate and close.

(Pl.'s App. Ex. 25.)  Wynne explained that "blank application kits" meant applications for loans

to Superior.  (Wynne Dep. 158.)  Coneys forwarded the email to his loan officers.  (Pl.'s App.

Ex. 25.)  Coneys himself signed loan applications for Superior while he was still employed with Plaintiff.  (Pl.'s App. Exs. 47 & 102.)

On July 9, 2009, the Plymouth Meeting branch's officer manager, Stacey Kracht, sent an email to Coneys stating, "the following is a list of all the loans that I have made copies of.  I spoke to each of the officers listed and compiled a list of loans they wanted to possibly bring." (Pl.'s App. Ex. 28.)  Kracht went on to list seventy-eight loans for six loan officers.  (*Id.*)  Kracht copied the loan files referenced in the email and drove them to Superior's office in Downingtown.  (Kracht Dep. 41-46, Pl.'s App. Ex. 17.)  At the time she copied the files, she was still employed with Plaintiff.  (*Id.* at 46.)

Superior began contacting customers who thought they were obtaining loans from National City.  One customer at the Plymouth Meeting branch sent an email to a loan officer, Anne Stulpin, on July 27, 2009, stating:

> I received a package earlier today from Adam Waldman at Superior Mortgage Company.  Can you please give me a little background on who he is and how this relates to National City Bank?

(Pl.'s App. Ex. 104.)

### 2.    *Copying and Downloading of Customer Lists and Databases*

On July 22, 2009, her last day of employment with Plaintiff, Wynne copied the entire contents of her National City-issued laptop onto a thumb drive and advised her assistant, Robertson, to do the same.  (Wynne Dep. 203-04, 219-21.)  Wynne took the thumb drive, which contained all the ACT databases for Coneys and for each of the loan officers over the last five years and took them with her to Superior.  (*Id.* at 203-04.)  Wynne uploaded the databases onto her Superior computer.  (*Id.* at 207.)  Wynne also took all of the backup CDs that were created

every quarter.  (*Id.*)  There were approximately 5,000 customers in the ACT databases

downloaded by Wynne.  (Bennett Decl. ¶ 5, Pl.'s App. Ex. 113.)  The files copied by Wynne also

included databases of potential refinance customers, generated using the ACT database.  (Pl.'s

App. Ex. 52.)  Wynne also copied Coneys' customer list, which included over 1,000 names.

(Bennett Decl. ¶ 6.)

    Prior to leaving National City, Wynne printed labels and sent letters to all of the

customers and realtors from the ACT databases of the loan officers.  (Wynne Dep. 297-99.)  The

letters announced Coneys' change of affiliation to Superior and stated that his team would also

be joining him at Superior.  (Pl.'s App. Ex. 30.)  Prior to sending the letter, Wynne sought and

received approval from Superior's marketing department, both on the content of the letter and

that it would be sent to all realtors and customers.  (Wynne Dep. 307-08.)   In addition to sending

the letters, Wynne also used the customer email addresses and sent those customers the following

email, which was dated July 25, 2009, and signed by Coneys:

**ATTENTION, ATTENTION, ATTENTION!!**

**Our Office has moved to Superior Mortgage!**

We know the importance of teamwork and searched for a strong respectable lender
that would accommodate our entire team.  Superior Home Mortgage is the perfect
home for us.  Superior is a direct lender that provides high quality mortgage
programs, great service, and reliable support which distinguishes them from the large
lenders while remaining successful at a time when smaller lenders have faltered.

Why leave NCM?  National City's Mortgage division did not fit into PNC's business
model.  PNC had made the decision to centralize Processing, Underwriting and
Closing to one hub location.  This eliminated the in-house service that allowed the
Plymouth Meeting branch to turn around approvals and closing packages quickly as
well as maintain personal relationships with you.  We were able to meet every
commitment date and resolve settlement questions immediately.
If you currently have a loan in process at National City, not to worry.  We are still

100% involved in all loans remaining at NCM until they close.

We are opening our branch in the same Plymouth Meeting Woods Office Park with the same inside team and same sales team.  (Yes . . . Katy, Sarah and Stacey have moved too!)  Our transition has been a smooth process so we can remain focused on servicing your mortgage needs.   Please do not hesitate to contact me with any questions or concerns.  Our new contact info is below:

(Pl.'s App. Ex. 94.)

### J.    Procedural History

Plaintiff filed the instant Complaint on November 4, 2009.  (Compl.)  Plaintiff asserts the following claims:  breach of contract against Pollicino and Coneys (Count I); misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. Cons. Stat. § 5301, *et seq.* ("PUTSA"), and New Jersey common law, against all Defendants (Count II); conversion against all Defendants (Count III); breach of fiduciary duty against Pollicino and Coneys (Count IV); unfair competition against all Defendants (Count V); tortious interference with contract against Superior (Count VI); tortious interference with contract against all Defendants (Count VII); aiding and abetting against Superior (Count VIII); a claim under the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") against Coneys (Count IX); civil conspiracy against all Defendants (Count X); and vicarious liability against Superior (Count XI).  (Compl.)

Plaintiff filed a Motion for a Preliminary Injunction on November 12, 2009.  (Pl.'s Mot. Prelim. Inj., ECF No. 2.)  Defendants filed responses to Plaintiff's motion for a preliminary injunction on December 11, 2009.  (Coneys' Resp. Prelim. Inj., ECF No. 26; Pollicino Resp. Prelim. Inj., ECF No. 27; Superior Resp. Prelim. Inj., ECF No. 27.)  On January 13, 2010, the parties entered into a Consent Preliminary Injunction Order ("Consent Order").  (ECF No. 33.) The Consent Order required Defendants to "return any and all confidential information taken

from or received from plaintiff that is in their or Superior's possession, custody or control . . . ." (*Id.* at 1.)  The Consent Order also preliminarily enjoined Defendants from engaging in any solicitation of Plaintiff's customers who had not also been a customer of Superior (*id.* at 2) and from soliciting any revenue-producing employees of plaintiff or its successors (*id.* at 4).

Defendant Coneys filed his Motion for Partial Summary Judgment on December 16, 2011 (Coneys Mot., ECF No. 63), along with an accompanying Memorandum of Law (Coneys Mem., ECF No. 63), and an appendix of Exhibits (Coneys App., ECF No. 70 (filed under seal)).  Also on that day, Defendant Superior filed its Motion for Partial Summary Judgment (Superior Mot., ECF No. 65), along with an accompanying Memorandum of Law (Superior Mem., ECF No. 68 (filed under seal)), and Defendant Marc Pollicino filed his Motion for Partial Summary Judgment (Pollicino Mot., ECF No 66) and accompanying Memorandum of Law (Pollicino Mem., ECF No. 66).  Defendants also filed a Joint Statement of Undisputed Facts on behalf of all Defendants.  (Def.'s Joint Stmt. (filed under seal)) together with an Appendix of Exhibits (Defs.' App.).  On January 24, 2012, Plaintiff filed responses to each of Defendants' Motions (ECF Nos. 76, 77 & 78), together with a Response to Defendants' Joint Statement of Undisputed Facts (Pl.'s Resp. to Joint Stmt, ECF No. 79 (filed under seal)), an Omnibus Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment (Pl.'s Mem., ECF No. 80 (filed under seal)), and an Appendix of Exhibits (Pl.'s App. (filed under seal)).  Defendant Superior filed a Reply Brief in Support of its Motion for Partial Summary Judgment on February 3, 2012. (Defs.' Reply, ECF No. 86.)  Trial is currently scheduled for March 5, 2012.

II.      SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will

not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving

party may identify an absence of a genuine issue of material fact by showing the court that there

is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d

Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth

specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A

party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to

particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts").  "Where the record taken as

a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no

'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  When deciding a

motion for summary judgment, courts must view facts and inferences in the light most favorable

to the nonmoving party.  *Anderson*, 477 U.S. at 255.  Courts must not resolve factual disputes or

make credibility determinations.  *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125,

1127 (3d Cir. 1995).

## III.    DISCUSSION

Superior requests that the Court enter summary judgment on the conversion claim and the unfair competition claim.  Superior also seeks partial summary judgment on the misappropriation of trade secrets claim, the tortious interference with contract claims and the secondary claims, aiding and abetting, civil conspiracy and vicarious liability.  Superior acknowledges that there are disputed issues of fact surrounding loans allegedly diverted from National City to Superior during the time period of June 2009 through December 2010, when the Consent Order was entered.  Superior concedes that to the extent any of the claims on which they seek partial summary judgment relate to these diverted loans, summary judgment is not appropriate.

Coneys requests that the Court enter summary judgment on the breach of contract claim and the misappropriation of trade secrets claim.  Coneys also seeks partial summary judgment on the conversion claim, the breach of fiduciary duty claim, the unfair competition claim, and the tortious interference with contract claim.  Pollicino requests that the Court grant him summary judgment on the claims for conversion, breach of fiduciary duty, unfair competition and tortious interference.  Pollicino seeks partial summary judgment on the claims for breach of contract, misappropriation of trade secrets and civil conspiracy.[10]

### A.    Preliminary Matters

#### 1.    Choice of Law

As an initial matter, we must address what law applies to each of Plaintiff's claims.  The

---

[10] With respect to those counts on which they seek partial summary judgment, Coneys and Pollicino take the same position as Superior.  To the extent the Counts assert claims that relate to the diversion of loans from Plaintiff to Superior, summary judgment is not appropriate.

Complaint asserts contractual, tort and statutory claims.  Superior is a New Jersey corporation.

Coneys is a Pennsylvania citizen and former manager of the National City's Plymouth Meeting,

Pennsylvania branch.  Coneys' employment agreement states that it shall be interpreted in

accordance with Ohio law.  Pollicino is a New Jersey citizen and former manager of National

City's Marlton, New Jersey branch.  Pollicino's employment contract does not contain a choice

of law provision.  Plaintiff's claims allege wrongful conduct that occurred in Pennsylvania and

New Jersey.

In federal diversity cases, a federal court applies the conflict-of-law rules of the forum

state in which it sits.  *See Garcia v. Plaza Oldsmobile LTD.*, 421 F.3d 216, 219 (3d Cir. 2005).

Under Pennsylvania choice-of-law rules, "the first question to be answered in addressing a

potential conflict-of-laws dispute is whether the parties explicitly or implicitly have chosen the

relevant law." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999).

Courts should apply the state law that the parties have agreed upon.  *Id.*; *Atl. Pier Assocs., LLC v.*

*Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 486 (E.D. Pa. 2009) ("Generally, if the parties

have agreed to the applicable law, that agreed upon law should be given effect.").  If there is no

agreement, the Court must determine whether a conflict actually exists.  *Hammersmith v. TIG*

*Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007).  "If two jurisdictions' laws are the same, then there is

no conflict at all, and a choice of law analysis is unnecessary." *Id.*

The parties do not dispute that Ohio law applies to the breach of contract claim against

Coneys.  Therefore, we will apply Ohio law to that claim.  With respect to the breach of contract

claim against Pollicino, the parties each cite to New Jersey law, and thus have agreed that New

Jersey law applies to that claim.  (*See* Pollicino Mem. 3-12; Pl.'s Mem. 59 n.147.)  Pollicino cites

only to New Jersey law in support of dismissal of the tort claims asserted against him.  Plaintiff

has not disputed this choice of law, and thus has consented to its application.  Coneys cites to

Pennsylvania law in support of dismissal of the tort claims against him, while Superior cites to

both Pennsylvania and New Jersey in support of dismissal of the tort claims asserted against it.

Plaintiff has not raised any dispute as to application of Pennsylvania law to the claims against

Coneys nor to the application of New Jersey or Pennsylvania law to the claims against Superior.

Because there is no true conflict between Pennsylvania law and New Jersey law with respect to

each of the tort claims asserted against Superior, we may use the states' laws interchangeably.

*Hammersmith*, 480 F.3d at 229.

### 2. *PUTSA Preemption*

As discussed hereinafter, we will not dismiss the misappropriation of trade secrets claim

on summary judgment.  Because of the many disputed issues of material fact, we are satisfied

that the decision as to whether the information at issue in this case constitutes a trade secret must

be left to the jury.  *See Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 410 (E.D. Pa.

2009) ("[D]etermining whether information constitutes a trade secret is generally left to the

jury.").  We note, however, that if a jury determines that the information at issue in this case

constitutes a trade secret under PUTSA, then many of Plaintiff's common law remedies will be

preempted.  *See* 12 Pa. Cons. Stat. § 5308 (stating that PUTSA displaces conflicting tort law

claims); *Youtie v. Macy's Retail Holding*, 626 F. Supp. 2d 511, 521 (E.D. Pa. 2009) (noting that

tort claims are preempted by PUTSA if they are based on the same conduct that is said to

constitute a misappropriation of trade secrets).

Tort claims that may or may not be preempted by PUTSA are not dismissed at the

summary judgment stage.  Instead, the question of whether certain tort claims are preempted

comes only after the jury has determined whether Defendants are liable for misappropriation of

trade secrets.  *See e.g.*, *Bro-Tech Corp.*, 651 F. Supp. 2d at 412 (denying summary judgment on

PUTSA claim and noting that "due to the displacing effect of [PUTSA], if and when any

Defendants are found at trial to have misappropriated Purolite trade secret information, Purolite's

other tort or restitutionary claims against them will be preempted to the extent such claims are

predicated on misappropriation of trade secrets as opposed to confidential or proprietary

information of other sorts.").  If we were to dismiss the tort claims now, then Plaintiff may be left

without a remedy to the extent a jury determines that the information at issue in this case does

not constitute a trade secret.  Obviously, this is an inappropriate result.

> 3.    *The Economic Loss Doctrine and the Gist of the Action Doctrine*

Pollicino and Coneys seek dismissal of the tort claims asserted against them under New

Jersey's economic loss doctrine and Pennsylvania's gist of the action doctrine, respectively.

In New Jersey, the economic loss doctrine prohibits plaintiffs from recovering in tort

economic losses to which they are entitled only by contract.  *Saltiel v. GSI Consultants, Inc.*, 788

A.2d 268, 280 (N.J. 2002); *see also Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226

F. Supp. 2d 557, 562 (D.N.J. 2002) ("[w]hether a tort claim can be asserted alongside a breach of

contract claim depends on whether the tortious conduct is extrinsic to the contract between the

parties.").  A remedy in tort will not arise from a contractual relationship between parties "unless

the breaching party owes an independent duty imposed by law."  *Saltiel*, 788 A.2d at 279;

*Beals v. Bank of Am., N.A.*, No. 10-5427, 2011 U.S. Dist. LEXIS 128376, at *47 (D.N.J. Nov. 4,

2011) (dismissing negligence claim under economic loss doctrine because defendants owed no

duty independent of the contract).

Pennsylvania's "gist of the action doctrine" has a similar effect in barring tort claims that arise by virtue of a contractual relationship.[11]   The doctrine "precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." *Kimberton*, 2011 U.S. Dist. LEXIS 139980, at *18.  Courts should focus the analysis on "whether actions lie from a breach of duties imposed as a matter of social policy or from the breach of duties imposed by mutual consensus." *Id.* (quoting *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 229 (3d Cir. 2008)).  The doctrine bars a plaintiff's "pursuit of a tort action for the mere breach of contractual duties, without any separate or independent event giving rise to the tort." *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 619 (E.D. Pa. 2010) (internal quotation marks omitted).

Plaintiff argues that barring claims under these doctrines is premature at this stage.  We agree.  This case is fraught with disputed issues of fact.  The jury will be tasked with deciding the factual disputes surrounding the contractual relationship between Pollicino and National City, and Coneys and National City.  To the extent a jury decides that the conduct of Coneys and Pollicino constituted a breach, or a partial breach, of their employment contracts, we will address application of the economic loss doctrine and gist of the action doctrine at that time.[12]  At

---

[11] Pennsylvania also recognizes the economic loss doctrine but typically applies that doctrine to cases involving product liability torts.  *Kimberton Healthcare Consulting, Inc. v. Primary Physiciancare, Inc.*, No. 11-4568, 2011 U.S. Dist. LEXIS 139980, at *20 (E.D. Pa. Dec. 6, 2011) (explaining Pennsylvania's distinction between economic loss doctrine and gist of the action doctrine as being one of pedigree).

[12] Plaintiff also argues that some of the tort claims are not barred by the gist of the action doctrine and the economic loss doctrine because the duties underlying those claims arise primarily from social policies.  *See e.g.*, *Murphy v. Mid East Oil Co.*, No. 06-1343, 2007 U.S. Dist. LEXIS 98455, at *17 (W.D. Pa. Jan. 18, 2007) (holding that gist of the action doctrine does

summary judgment, before a jury has had the opportunity to decide the disputed issues of fact, it is simply premature for us to determine the application of these doctrines.[13]  This approach is consistent with the approach taken with respect to tort claims and PUTSA preemption, which is to postpone determining what claims are preempted by PUTSA until after the jury has determined whether a defendant has misappropriated trade secrets.

### B.      Breach of Contract Claim (Count I)

Plaintiff alleges that Coneys and Pollicino breached their employment agreements with Plaintiff by "directing the copying of [Plaintiff's] customer lists and other confidential customer information, using the misappropriated information against Plaintiff's interests, supervising the diversion of [Plaintiff's] loans to Superior, soliciting [Plaintiff's] employees to leave en masse and switch their allegiance to Superior, and performing various other kinds of work for Superior

---

not bar breach of loyalty claim); *eToll, Inc. v. Elias/Savion Adver., Inc.*, 811 A.2d 10, 14-15 (Pa. Super. Ct. 2002) (stating that "a claim should be limited to a contract claim when the parties obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts") (quoting *Bohler-Uddeholm Am., Inc., v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. Pa. 2001)).  We agree that under certain circumstances, the duties underlying the tort claims against Coneys and Pollicino arise primarily from social policies.

[13]  On this point, we note that Pollicino relies entirely on one case, *Trico Equip., Inc. v. Manor*, No. 08-5561, 2011 U.S. Dist. LEXIS 17936 (D.N.J. Feb. 22, 2011), for the proposition that all of the tort claims against him should be dismissed under the economic loss doctrine.  In *Trico*, the Court denied the plaintiff's motion for summary judgment on claims for misappropriation of trade secrets, tortious interference with prospective economic advantage, unfair competition breach of duty of loyalty, breach of covenant of good faith and fair dealing, unjust enrichment, and civil conspiracy. *Id.* at *10-25.  However, this was only after having determined as a matter of law that defendant had breached his employment contract. *Id.* at *8.  In this case, we do not determine as a matter of law that Coneys and Pollicino breached their employment agreements with National City.  That question is left for the jury.  Moreover, we have been unable to locate any cases, nor have Defendants pointed to any, where New Jersey state courts have applied the economic loss doctrine to bar the types of claims asserted in this action.

while still employed by [Plaintiff]."  (Pl.'s Resp. 56-57.)  We will address the claims against

Pollicino and Coneys separately.

> 1.    *Pollicino*

Pollicino seeks partial summary judgment on the breach of contract claim, leaving for

trial only that portion of the claim that pertains to loans diverted from Plaintiff to Superior.

Pollicino first argues that the Incentive Plan, which contained no restrictive covenants similar to

those contained in his National City employment agreement, expressly canceled or superseded

his employment agreement.  The "Complete Plan" clause contained in the Incentive Plan states

that "[t]his Plan and all of its attachments supersede all previous performance-based incentive

programs applicable to the Participant and all prior incentive plans, agreements and

understandings, written or oral are replaced by this Plan and are no longer of any force or effect."

(Pl.'s App. Ex. 86 at ¶ 8.5.)  The Incentive Plan further states:

> This Plan is not a contract of employment for a period of time, and does not alter
> any Participant's employment-at-will status.  This Plan does not modify or
> supercede any of the rules, policies or procedures of PNC, which are otherwise
> applicable to Participants.

(*Id.* at ¶ 1.1.)

Under New Jersey law, "[t]he general rule is that a subsequent contract covering the same

subject matter and made by the same parties, but containing terms inconsistent with the former

contract so that the two cannot stand together, rescinds, supersedes and substitutes for the earlier

contract and becomes the only agreement on the part of the parties on the subject matter."  *Kant*

*v. Seton Hall Univ.*, No. 03-6135, 2008 U.S. Dist. LEXIS 638, at *19-20 (D.N.J. Jan. 4, 2008)

(quoting *Rosenberg v. D. Kaltman & Co.*, 101 A.2d 94, 96 (N.J. Ch. 1953)).  Courts look to the

contracts themselves to determine whether it was the intention of the parties to discharge the

earlier contract entirely. *Rosenberg*, 101 A.2d at 96. "The terms of the second contract must be

so inconsistent with those of the former contract that they cannot stand together." *Id.*

Pollicino has failed to show that the Incentive Plan supersedes his employment contract in

its entirety. The terms of the two contracts are not so inconsistent that they cannot stand

together. *See e.g.*, *New Jersey Sports Prods. v. Don King Prods.*, No. 97-1175, 1997 U.S. Dist.

LEXIS 23209, at *30-31 (D.N.J. Oct. 27, 1997) (holding that subsequent contract did not

supersede earlier contract where the defendant failed to show that the terms of the two

agreements were so inconsistent that they could not stand together); *Rosenberg*, 101 A.2d at 97)

(holding that covenant in subsequent employment contract did not cancel out covenant in earlier

employment contract).

Rather, the Incentive Plan unambiguously modifies only those portions of Pollicino's

employment agreement that addressed compensation structure. In addition to the provisions

related to the payment of commissions, Pollicino's employment agreement also contains

provisions related to acknowledgment of real estate industry regulations, treatment of proprietary

and confidential information, rendering service to other businesses during employment with

Plaintiff, and adherence to company policies and procedures. The Incentive Plan does not

contain similar terms. Thus there is no inconsistency. The only difference lies in the

compensation schedule and commission structure. However, Pollicino's employment agreement

explicitly permits unilateral modification by Plaintiff of these compensation terms. Specifically,

his agreement states that "National City may, in its sole discretion, revise this Loan Officer

Compensation Agreement, including the commission structure outlined above, without any

advance notice to you." (Pl.'s App. Ex. 62 at ¶ IX.)  In addition, each addendum attached to

Pollicino's employment agreement was separately signed by Pollicino and contained the same

language that granted Plaintiff the discretion to revise the terms of the addenda without notice to

Pollicino.

Moreover, the "Complete Plan" clause that Pollicino relies upon supports Plaintiff's

position that the Incentive Plan did not cancel out his employment contract or the covenants

contained therein.  The clause is drafted to make clear that the Incentive Plan supersedes only

"previous performance-based incentive programs applicable to [Pollicino]." (Pl.'s App. Ex. 86 at

¶ 8.5.)  The clause further narrows this application to "all prior incentive plans, agreements, and

understandings, written or oral." (*Id.*)  Because Plaintiff modified "plans, agreements, and

understandings" with the word "incentive," it is clear that the Incentive Plan was not intended to

modify all aspects of the employment relationship.  Plaintiff could have drafted the clause more

broadly to do this, but it chose not to.  We are satisfied that Plaintiff only intended to modify

those portions of the National City employment agreements that pertained to commissions and

compensation structure, and not to the other provisions governing the entire employment

relationship.

The cases cited by Pollicino do not support his position, but rather support the finding

that the Incentive Plan did not supersede Pollicino's employment agreement in its entirety.  In

*Avatar Bus Connection, Inc. v. Unit-Marts, Inc.*, No. 04-1866, 2005 U.S. Dist. LEXIS 37506,

*22-23 (D.N.J. Dec. 29, 2009), the court found that a second brokerage agreement canceled out

the first brokerage agreement, but only because the second agreement explicitly stated "[t]his

Agreement supersedes all of the terms and conditions of the Expired Brokerage Agreement" and

spelled out in detail only those provisions of the first agreement that survived.  *Id.*  The Incentive

Plan makes no reference to Pollicino's employment agreement.  In addition, in *Innoviant*

*Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 193 (N.D.N.Y. 2005), the court determined

that a restrictive covenant contained in an earlier employment agreement was superseded by a

subsequent agreement because the employee signed a separate document "disavowing the

existence of any 'express or implied contract of employment or agreement of any type between

[the employee] and [the employer].'"  *Id.*  Pollicino never signed any such agreement.  Indeed, he

did not even sign the Incentive Plan.[14]

  Pollicino next argues that even if his employment agreement was not superseded by the

Incentive Plan, he is entitled to summary judgment because (1) the non-solicitation clause is not

contained in his employment agreement, but rather is contained in his offer letter, which was

superseded by the employment agreement, (2) he did not "solicit" employees to leave National

City, and (3) the non-disclosure and confidentiality provisions do not apply to his personal

costumer contact lists.

  Pollicino claims that his employment agreement did not contain a non-solicitation clause,

and that the August 18, 1997 offer letter, which did contain such a clause, was superseded by his

employment agreement.[15]  As Plaintiff points out, whether the offer letter was superseded by

---

  [14] The Incentive Plan was a unilateral plan implemented by Plaintiff.  It was signed by
Plaintiff's senior management but did not require signatures of any of the loan officers of branch
managers.

  [15] Coneys' employment agreement did contain a non-solicitation clause that prohibited
him from soliciting employees to leave employment with Plaintiff during the course of Coneys'
employment and for a period of six months after termination of employment for any reason.

Coneys' employment agreement is not at issue.  The offer letter prohibited Pollicino from

soliciting employees for a period of six months *after* his employment terminated with National

City.  Plaintiff argues that Pollicino solicited his loan officers to leave Plaintiff and join him at

Superior *while* Pollicino was still employed with Plaintiff.  Plaintiff asserts that this conduct

violated the employment agreement's provision that prohibited Pollicino from "rendering

services to any other business or persons without National City Mortgage's prior written

consent."  The record is replete with disputed issues of fact related to recruitment of National

City employees, whether they left on their own volition, or whether they were persuaded,

encouraged, or solicited by Pollicino.  A jury, and not this Court, must decide the level of

involvement Pollicino had with the departure of his loan officers, and whether his actions

constituted a breach of his employment agreement.

Finally, Pollicino argues that the Proprietary and Confidential Information provision of

his employment agreement did not prohibit him from retaining copies of his customer contact

information.  The relevant section of the agreement states:

> You understand that during the course of your employment with National City
> Mortgage, you will be given access to confidential and proprietary information and
> trade secrets . . . including but not limited to mortgage loans, mortgage loan
> applications, customers, customer lists, customer files, mortgage loan pipeline reports
> . . . and other internal reports, data, information and documentation ("Confidential
> Information").  You agree that you will not disclose and will not reproduce any
> compilation of Confidential Information.

(Pl.'s App. Ex. 70 at ¶ VII.)  Pollicino contends that the provision only applies to confidential

information that was *given* to Pollicino by National City, and that the lists he copied and brought

with him to Superior were lists he created himself.  Pollicino's argument ignores the fact that by

virtue of his employment relationship, he was "given access" to customers, loan applications and

other marketing tools and resources to generate the information comprising his customer lists. Moreover, Pollicino ignores Plaintiff's allegations that, in addition to his customer lists, Pollicino also took other confidential information with him to Superior.  We are satisfied that based on the record, there exist genuine issues of material fact with regard to the question of whether Pollicino violated this provision of his employment agreement.

Accordingly, we will deny summary judgment on Plaintiff's breach of contract claim against Pollicino.

### 2.    Coneys

Coneys also seeks to dismiss the breach of contract claim against him.  Coneys first argues that the "Complete Plan" clause contained in the Incentive Plan had the effect of canceling out his employment agreement in total.  We have determined that under New Jersey law, the Incentive Plan did not cancel out Pollicino's employment agreement in its entirety.[16] The same outcome is reached applying Ohio law to Coneys' employment agreement.  Under Ohio law, the purpose of contract construction is to "ascertain and give effect to the intent of the parties." *Foster Wheeler Envirespose, Inc. v. Franklin Cty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).  "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.*  Extrinsic evidence cannot be used to explain an unambiguous contract. *Kilbury v. Bennett*, No. 98-39, 1999 Ohio App. LEXIS 2785, at *10 (Ohio Ct. App. June 2, 1999).  "Thus, where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or

---

[16]  Apart from the choice of law provision and the presence of an explicit non-solicitation clause, Coneys' employment agreement is very similar to Pollicino's employment agreement.

difficulty as to the proper application of those words to claimants under the instrument, or as to the subject matter to which the instrument relates, such instrument is always to be construed according to the strict, plain common meaning of the words themselves." *Id.* at *10-11.

As explained *supra* ¶ III.B.1, the language of the "Complete Plan" clause contained in the Incentive Plan is unambiguous. The Incentive Plan supersedes those provisions of Coneys' employment agreement that deal with commission and compensation structure. The Incentive Plan does not cancel out the other terms of the employment agreement relating to treatment of confidential and proprietary information or non-solicitation of employees. Because it is unambiguous, the parol evidence rule does not apply. *Mansfield Plumbing Prods. LLC v. Mariner Partners, Inc.*, 300 F. Supp. 2d 540, 545 (N.D. Ohio 2004) ("If there is no ambiguity in the language of a contract, the court should not interpret words beyond their plain meaning or rewrite the contract to provide for a more equitable result.").

Next, Coneys argues that even if his employment agreement was not superseded by the Incentive Plan, it was nevertheless rendered unenforceable by Plaintiff's breach of that agreement. Coneys' suggests that Plaintiff's unilateral change to the compensation provisions of the employment agreement constituted a breach of that agreement, which in turn rendered the agreement unenforceable. This argument ignores the fact that Coneys' employment agreement, like Pollicino's agreement, explicitly granted Plaintiff the right to change the terms of the compensation structure. Coneys' reliance on *Brakefire, Inc. v. Overbeck*, 878 N.E.2d 84 (Ohio Ct. Com Pls. 2007), is misplaced. In *Brakefire*, the court determined that an employee was not bound by a non-compete clause in his employment agreement after his employer had breached the agreement by unilaterally changing the compensation of its employees. *Id.* at 100-03. The

court determined, after having found the contract to be ambiguous and considering parol

evidence to determine intent, that the employment agreement required that the parties mutually

agree upon any changes in compensation. *Id.* Coneys' employment agreement did not contain

any provision requiring mutual consent to changes in commissions or compensation structure.

Rather, Coneys' agreement states in bold and underlined print that "**National City may in its**

**sole discretion revise this Agreement, including the commission structure outlined above**."

(Pl.'s App. Ex. 70 at ¶ IX.)  Each addendum, many of which address commission and

compensation, is signed separately by Coneys, and contain similar language.  We can certainly

understand why Coneys and Pollicino resigned from their employment with Plaintiff in light of

the significant changes to their compensation structure.  However, this does not entitle Coneys or

Pollicino to disregard the other terms of their employment agreements.

Accordingly, we will deny summary judgment on Plaintiff's breach of contract claim

against Coneys.

### C.      Misappropriation Of Trade Secrets Claim (Count II)

Plaintiff asserts a claim for misappropriation of trade secrets under PUTSA and under

New Jersey common law.  Plaintiff contends that Defendants misappropriated and used

documents falling into five general categories:  (1) customer lists taken by Wynne for Coneys

and other Plymouth Meeting loan officers, which included names, addresses, and email addresses

of customers; (2) lists of existing and potential customers taken by Pollicino and Moran, which

included names, addresses, email addresses, and employment information and loan information;

(3) customer ACT databases, which included customer names, addresses, employment

information, loan details, dates of birth, and Social Security numbers; (4) loan applications and

other loan documents; and (5) communications from potential customers whose business was diverted to Superior.

The thrust of Defendants' argument in support of dismissing this claim is that the customer lists that were downloaded and/or copied and taken to Superior do not constitute trade secrets.  Defendants argue that customer and referral lists are not trade secrets because they could be easily recreated using public sources, and because Coneys, Pollicino and the other loan officers developed the lists themselves.  Defendants also argue that Plaintiff's claim fails because they are unable to show that Plaintiff was harmed by the alleged misappropriation.  Finally, Superior argues that the claim must be dismissed against it because Superior did not know that the customer lists were acquired by improper means.

<em>1.    Customer Lists as Trade Secrets</em>

Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), a "Trade Secret" is defined as follows:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302.[17]

---

[17] PUTSA defines misappropriation as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

While PUTSA has displaced Pennsylvania's common law tort for misappropriation of trade secrets, the statute did not affect the definition of trade secret. *Youtie*, 626 F. Supp. 2d at 522 n.10.[18]  Pennsylvania courts use the following factors when determining whether information is protected as a trade secret:  "(1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated

---

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i) used improper means to acquire knowledge of the trade secret;

    (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

        (A) derived from or through a person who had utilized improper means to acquire it;

        (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. § 5302.

[18] The Pennsylvania common law definition of trade secret, which was adopted from the Restatement of Torts, includes "formula, pattern, device, or compilation of information of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitions who do not know or use it."  *Pestco, Inc. v. Associated Prods., Inc.*, 880 A.2d 700, 706 (Pa. 2005).  Pennsylvania cases decided under PUTSA rely on pre-PUTSA cases for determining whether information constitutes a trade secret. *See, e.g.*, *Brett Senior & Assoc. v. Fitzgerald*, No. 06-1412, 2007 U.S. Dist. LEXIS 50833, at *21-24 (E.D. Pa. July 13, 2007).

legitimately by others." *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir.

2010) (citing *Crum v. Bridgestone/Firestone N. Am., LLC*, 907 A.2d 578, 585 (Pa. Super. Ct.

2006).

      Pennsylvania recognizes that customer lists can constitute trade secrets for purposes of

PUTSA; however, customer data "is at the very periphery of the law of unfair competition." *Iron

Age Corp. v. Dvorak*, 880 A.2d 657, 663 (Pa. Super. Ct. 2005).  "The concept of a trade secret is

at best a nebulous one." *Van Prods. Co. v. Gen. Welding & Fabricating Co.*, 213 A.2d 769, 775

(Pa. 1965).  Thus, many courts have determined that "[t]he question of whether certain

information constitutes a trade secret is a question of fact to be resolved by the jury or the trier of

fact." *Camelot Tech., Inc. v. RadioShack Corp.*, No. 01-4719, 2003 U.S. Dist. LEXIS 2517, at

*25 (E.D. Pa. Feb. 13, 2003); *see also Bro-Tech*, 651 F. Supp. 2d. at 410.  Determinations are

made on a case-by-case basis, and several limitations apply.  *Brett Senior*, 2007 U.S. Dist. LEXIS

50833, at *21.  Trade secrets do not include "information that can be readily obtained from

another source nor information that is not the plaintiff's intellectual property." *Id.; see also*

*Pestco, Inc.*, 880 A.2d at 706-07.

      Under New Jersey common law, a claim for misappropriation of trade secrets requires

plaintiff to show that:  "(1) a trade secret exists; (2) the information comprising the trade secret

was communicated in confidence by plaintiff to the employee; (3) the secret information was

disclosed by that employee and in breach of that confidence; (4) the secret information was

acquired by a competitor with knowledge of the employee's breach of confidence; (5) the secret

information was used by the competitor to the detriment of plaintiff; and (6) the plaintiff took

precautions to maintain the secrecy of the trade secret." *Rycoline Prods., Inc. v. Walsh*, 756 A.2d

41

1047, 1052 (N.J. Super. Ct. App. Div. 2000).  Like Pennsylvania, New Jersey also recognizes the

protection of customer lists.  *Hollister v. Fiedler*, 92 A.2d 52, 59 (N.J. Super. Ct. App. Div.

1952);  *AYR Composition, Inc. v. Rosenberg*, 619 A.2d 592, 597 (N.J. Super. Ct. App. Div.

1993); *see also Lamorte Burns & Co, Inc. v. Walters*, 770 A.2d 1158, 1166 (N.J. 2001) (finding

that service businesses' customer lists have been afforded trade secret protection in some

instances); *Esquire Deposition Servs., LLC v. Boutot*, No. 09-1526, 2009 U.S. Dist. LEXIS

52207, at *30 (D.N.J. June 19, 2009) (holding that the plaintiff's customer lists and pricing

information constituted trade secrets under New Jersey law).

   The first limitation—that customer lists are not trade secrets if they can be easily or

readily obtained through some other independent source—requires the Court to analyze

"(1) whether the information contained on the customer lists is 'obtainable' in significant part;

and (2) whether it is 'freely' available without 'great difficulty.'" *Gen. Bus. Servs. v. Rouse*, 495

F. Supp. 526, 530 (E.D. Pa. 1980) (finding customer lists were trade secrets where agents spent

three to four days to compile only approximately half of the names on the customer list); *see also*

*Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 323 n.2 (E.D. Pa. 1998) ("Customer lists

and confidential business information, however, cannot be trade secrets if they are easily or

readily obtained, and without great difficulty through independent source other than the trade

secret holder."); see also *AYR Composition*, 619 A.2d at 597 (reasoning that customer lists of

service companies are protectable trade secrets because "the names and addresses of its

customers are not open to and ascertainable by everyone; they are the private information and

property of the company").

    Here, there are disputed issues of fact with respect to the ability of Coneys and Pollicino

to obtain the information contained in their customer lists and whether access to the information can be accomplished easily and without great effort.  We recognize that some of the information contained in the customer lists and ACT and Mortgage Quest databases is publicly available. Plaintiff's expert, Laura Borrelli, points out that every mortgage is recorded with a public office, usually the recorder of deeds for each county.  (Borrelli Rept. 8, Pl.'s App. Ex. 112.)  Defendants also argue that because mortgage lists can be purchased online, the information is publicly available and easily accessible.  However, it is unclear what information these publicly available documents reveal.  Certainly, Social Security numbers are not publicly available.  Plaintiff points out that email addresses are also not publicly available.  The evidence shows that customer email addresses were utilized to send an announcement about Coneys' new affiliation with Superior.  If Coneys and Wynne did not have the benefit of the customer list, it would have taken significant time and effort for them to first locate the customers' addresses at the recorder of deeds office or on the list purchased online, and then contact each customer to obtain their email address.

The second limitation—that a trade secret cannot be comprised of information that is not the plaintiff's intellectual property—also involves disputed issues of fact to be resolved by a jury. Pollicino and Coneys testified that they created the customer lists, and that the lists contain contact information they brought to National City from previous employers.  Plaintiff disputes this point, and offers evidence showing that Defendants' customer lists contained National City customers.  Plaintiff also offers evidence that it made significant efforts to protect the secrecy of the customer information, such as including non-disclosure provisions in its employment contracts and Employee Handbook, and sending company-wide memoranda reinforcing its position that customer data, including customer lists, should remain strictly confidential.

43

Finally, Plaintiff points out that the managers acquired the customers and created the customer lists "by reason and in the course of their employment" with Plaintiff.  On this point, Plaintiff has invested significant resources, not only in the cost of the databases which compile and organize the customer information (e.g., ACT and Mortgage Quest), but also in the cost of marketing resources and marketing professionals that assist the loan officers in acquiring the customers in the first place.  The Pennsylvania Supreme Court commented on the nature of customer lists as protectable trade secrets:

> In many businesses, permanent and exclusive relationships are established between customers and salesman. The customer lists and customer information which have been compiled by such firms represent a material investment of employer's time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a "trade secret" for which an employer is entitled to protection, independent of a non-disclosure contract . . . .

*Morgan's Home Equipment v. Martucci*, 136 A.2d. 838, 842 (Pa. 1957) (footnote omitted).  The extent of Plaintiff's investment in the compilation of the customer lists in this case is a disputed issue of fact.

Plaintiff alleges that in addition to the customer lists and databases, Defendants also misappropriated loan applications and other loan documents, and communications from potential customers whose business was diverted to Superior.  Defendants have not attempted to argue that this information is not a trade secret.  A jury must make this determination.

### 2.   Showing of Harm

Defendants argue that even if customer lists constitute trade secrets, summary judgment should be granted because Plaintiff has failed to show how it has been harmed by the alleged misappropriation.  Under PUTSA, a claim for damages must be based on the plaintiff's "actual

44

loss," the defendant's "unjust enrichment," or "a reasonable royalty for [the] misappropriator's unauthorized disclosure or use of a trade secret." 12 Pa. Cons. Stat. § 5304.  Under New Jersey law, a plaintiff must show that the "secret information was used by the competitor to the detriment of plaintiff." *Rycoline Prods*., 756 A.2d at 1052.

Plaintiff has offered sufficient evidence of harm to survive summary judgment.  In addition to actual loans diverted from Plaintiff to Superior, there is evidence showing that customers and potential customers who were contacted chose to do business with Superior instead of with Plaintiff.  The record shows that Moran, Pollicino's assistant, used the email addresses from the list of existing and potential customers uploaded from her National City laptop to her Superior laptop to inform those customers that Pollicino and Moran had joined Superior.  (Pl.'s App. Ex. 97.)  The record also shows that the customer lists were used when Wynne, Coneys' assistant, sent an email promoting Superior and disparaging Plaintiff.  The email stated:  "Why leave [National City]? National City's Mortgage did not fit into PNC's business Model."  The email further implied that with the structural changes implemented by Plaintiff "eliminated the in-house services that allowed the Plymouth Branch to turn around approvals." (Pl.'s App. Ex. 95.)  The same email was sent by former National City loan officers who moved to Superior.  (*Id.* at Ex. 96.)  Moreover, Defendants do not dispute that a number of loans were diverted to Superior from National City.  This, in and of itself, is evidence that the alleged misappropriation caused harm to Plaintiff.

        3.    *Knowledge by Superior that the Lists were Acquired by Improper Means*

Finally, Superior argues that even if the customer lists constitute trade secrets, it had no knowledge that they acquired the lists by improper means.  Under PUTSA, Plaintiff must

establish the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  12 Pa. Cons. Stat. § 5302(1).  "Improper means" under PUTSA includes "breach of a duty to maintain secrecy."  *Id.*

Again, we are satisfied that a reasonable jury could find, based on all of the evidence, that Superior had knowledge that the customer lists were acquired by improper means.  Superior does not dispute that it knew that customer lists were brought to Superior by National City employees.  In fact, Superior assisted in uploading the customer lists to Superior-issued computers.  Superior argues that they believed that allowing National City employees to bring customer lists to Superior was "consistent with industry customs and norms."  (Superior Mem. 9.)  Superior's argument is belied by its own policy.  Prior to starting employment with Superior, all employees are required to sign an acknowledgment form, swearing that before terminating employment with their former employer, they returned all confidential and proprietary information, including names and address of customers, to their former employer.  (*See* Pl.'s App. Ex. 69.)

Accordingly, summary judgment on the misappropriation of trade secrets claims, both under PUTSA and under New Jersey common law must be denied.

### D.    Conversion Claim (Count III)

Count III is a claim against all Defendants for conversion of Plaintiff's confidential information.[19]  Plaintiff alleges that Defendants used the customer lists and other confidential and

---

[19] Plaintiff states that its conversion claim applies only to confidential information that does not rise to the level of trade secrets.  Otherwise, as Plaintiff points out, the common law conversion claim would be preempted by PUTSA.  *See* 12 Pa. Cons. Stat. § 5308; *Youtie*, 626 F. Supp. 2d at 521.  To the extent a jury determines that Defendants are liable for misappropriation of trade secrets, the conversion claim will be preempted.

proprietary information to solicit National City customers, prospects and accounts, and divert

that business to Superior.  (Compl. ¶ 96.)  Pollicino and Coneys seek dismissal of the conversion

claim based on the economic loss doctrine and the gist of the action doctrine.  Superior argues

that the conversion claim should be dismissed because the claim fails as a matter of law.

We have determined that barring tort claims based on the economic loss doctrine and the

gist of the action doctrine is premature at this summary judgment stage.  After the jury and this

Court has heard all of the facts, we will address whether the claim is barred by these doctrines.

Similarly, whether the conversion claim is preempted by PUTSA is also premature and will

depend on whether the jury finds for Plaintiff on the misappropriation of trade secrets claims.

Plaintiff has offered sufficient evidence in support of the conversion claim to survive

summary judgment.  Superior's argument that Plaintiff has failed to establish a necessary element

of the claim is without merit.  Specifically, Superior argues that Plaintiff retained copies of the

allegedly converted customer lists and databases, and thus cannot state a claim for conversion.

(Superior Mem. 10 (*citing Fainsbert v. Cuthbert*, No. 06-2017, 2006 U.S. Dist. LEXIS 51372

(D.N.J. July 27, 2006) ("An owner cannot state a claim for conversion when it retains originals

or other copies of documents another improperly uses because the owner is not deprived of the

beneficial use of the information.").)

Defendants confuse traditional concepts of conversion with the claim of conversion as it

relates to confidential information.  Both Pennsylvania and New Jersey recognize that

confidential information need not rise to the level of trade secret to be protected.  *See Lamorte

Burns & Co., Inc. v. Walters*, 770 A.2d 1158, 1168 (N.J. 2001) (recognizing protection for

confidential and proprietary client claim file information taken by defendant); *Pestco*, 880 A.2d

at 706 (recognizing protection for misappropriation of confidential information that does not rise to the level of trade secret); *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 481-82 (E.D. Pa. 2010) (plaintiff stated a claim for "conversion of confidential business information" under the Restatement (Second) of Torts § 759); *Hill v. Best Med. Int'l, Inc.*, No. 07-1709, 2011 U.S. Dist. LEXIS 123845, at *54 (W.D. Pa. Oct. 25, 2011) ("Even after the enactment of PUTSA, courts applying Pennsylvania law have continued to recognize a separate tort of conversion regarding confidential or proprietary information.").  For this type of conversion claim, Plaintiff need not prove that it was dispossessed of the converted item.  Thus, it is irrelevant that Plaintiff retained copies of the customer lists and databases.

To establish a claim for conversion of confidential information, a plaintiff must show that the defendant, "for the purpose of advancing a rival business interest, procures by improper means information about [plaintiff's] business" and that "harm [was] caused by [the defendant's] possession, disclosure or use of the information."  *Pestco*, 880 A.2d at 708-09 (quoting Restatement of Torts § 759); *Hill*, 2011 U.S. Dist. LEXIS 123845, at *54 (same).  When viewing the facts in Plaintiff's favor, we are satisfied that a reasonable jury could find Defendants liable for conversion of Plaintiff's confidential information to the extent this information does not rise to the level of trade secret.

### E.     Breach of Fiduciary Duties Claim (Count IV)

Plaintiff alleges that Pollicino and Coneys breached their fiduciary duty of loyalty to Plaintiff by:  (a) soliciting National City customers to transfer their business to Superior; (b) recruiting National City employees to join Superior; (c) misappropriating or causing to be misappropriated confidential information belonging to National City; (d) acting for the purpose

48

of destroying Plaintiff's business in Plymouth Meeting and Marlton and expropriating that

business for Superior; (e) concealing their activities and misdeeds from Plaintiff; and (f) in the

case of Coneys, attempting to steal office equipment from the Plymouth Meeting branch for use

at Superior.

Under New Jersey law, every "employee owes a duty of loyalty to [his] employer."

*Auxton Computer Enter., Inc. v. Parker*, 416 A.2d 952, 956 (N.J. Super. Ct. App. Div. 1980).

The duty of loyalty requires the that the employee not act contrary to the employer's interest

during employment. *Id.* "In cases where the employee offers substantial assistance to a

competitor, the employee will be liable for breach of duty of loyalty." *Id.* Pennsylvania also

recognizes that employees, as agents of their employer, owe fiduciary duties of loyalty. *Boyce v.*

*Smith-Edwards-Dunlap Co.*, 580 A.2d 1382, 1389 (Pa. Super. Ct. 1990). The duty of loyalty

requires that an employee "refrain from competing with the [employer] and from taking action on

behalf of, or otherwise assisting, the [employer's] competitors throughout the duration of the

agency relationship, as well as a duty not to use property or confidential information of the

[employer] for the [employee's] own purpose or those of a third party." *Frontier Constr. Co. v.*

*Mazzella*, No. 09-794, 2009 U.S. Dist. LEXIS 106042, at *11 (W.D. Pa. Nov. 13, 2009) (quoting

Restatement (Third) of Agency, §§ 8.04 & 8.05 (2006)).

Pollicino argues that the claim is barred by New Jersey's economic loss doctrine. Coneys

similarly argues that the claim is barred by Pennsylvania's gist of the action doctrine. We have

determined that application of these doctrines to bar tort claims is premature at this summary

judgment stage. In any event, this claim would not be barred by the economic loss doctrine or

the gist of the action doctrine. Claims for breaches of fiduciary duty of loyalty are situations

49

where the parties' "obligations are not defined by the terms of contract, but rather by larger social policies embodied in the law of torts." *Murphy*, 2007 U.S. Dist. LEXIS 98455, at *16 (claim for breach of duty of loyalty not barred by gist of the action doctrine); *Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 U.S. Dist. LEXIS 11088, at *21 (E.D. Pa. Feb. 14, 2008).  Viewing the facts in a light most favorable to Plaintiff, which we are required to do, a reasonable jury could find that the evidence supports the assertion that Pollicino and Coneys breached their fiduciary duty of loyalty to Plaintiff.  Accordingly, we will deny summary judgment with respect to Count IV.

**F.      Unfair Competition Claim (Count V)**

Plaintiff alleges in Count V that "Defendants took steps for the purpose of, *inter alia*, destroying National City's ability to do business in Plymouth Meeting, Pennsylvania and Marlton, New Jersey."  (Compl. ¶ 107.)  Plaintiff alleges that it suffered harm in the form of lost customers, lost customer relationships, and lost employees.  (*Id.* at ¶ 108.)  Superior seeks to dismiss the claim in its entirety, and argues that Plaintiff has failed to show the necessary elements of the claim.  Pollicino and Coneys argue that the claim is barred by the economic loss doctrine and the gist of the action doctrine.[20]

Under Pennsylvania law, "offering employment to another company's at-will employee is not actionable in and of itself."  *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. Ct. 2003).  "However, systematically inducing employees to leave their present employment is actionable 'when the purpose of such enticement is to cripple and destroy an integral part of a competitive business organization rather than to obtain the services of particularly gifted or

_____

[20] Again, the application of the economic loss doctrine and gist of the action doctrine to bar tort claims is premature at this stage.

skilled employees.'"  *Id.* (quoting *Albee Homes, Inc. v. Caddie Homes, Inc.*, 207 A.2d 768, 771

(Pa. 1965)).  A claim may also arise if the purpose of the inducement is for the "employees to

commit wrongs, such as disclosing their former employer's trade secrets or enticing away his

customers."  *Id.*; *Albee Homes,* 207 A.2d at 771.  Similarly, under New Jersey law, a claim for

unfair competition requires evidence of bad faith of malicious conduct.  *Reckitt Benckiser Inc. v.*

*Tris Pharma, Inc.*, No. 09-3129, 2011 U.S. Dist. LEXIS 19713, at *26 (D.N.J. Feb. 28, 2011).

The first question we must decide is whether the evidence conclusively shows that the

purpose of Superior's offer of employment to Coneys and Pollicino and the other former

National City employees was for the purpose of securing "particularly skilled employees" and not

for the purpose of taking them away and harming Plaintiff.  *Reading Radio, Inc.*, 833 A.2d at

212.  We believe it does not.  Defendants rely almost entirely on the loan officer attrition rate and

the testimony of former National City loan officers who testified that their departure was due to

the structural and compensation changes implemented by Plaintiff in mid-2009.  However, the

record shows that, aside from the attrition rate and the testimony of loan officers, Pollicino,

Coneys and George Allen from Superior, were heavily involved in the departure of employees

from Marlton and Plymouth Meeting to Superior.  Pollicino and Coneys requested that George

Allen send them applications for their loan officers.  Allen provided the applications, which were

forwarded by Coneys to the personal email addresses of the loan officers.  Superior organized a

training session for the loan officers in both the Marlton and Plymouth Meeting branches, while

the loan officers were still employed with Plaintiff.

The record also shows that Pollicino and Coneys were shopping around for employers for

their entire teams.  In Pollicino's email to Allen after their first meeting, Pollicino requests that

Allen let him know "whether we are a good fit."  In his email announcing his affiliation with Superior, Coneys states that "we know the importance of teamwork and searched for a strong respectable lender that would accommodate our entire team."  Coneys and Pollicino requested that Allen send them employment applications for all of their loan officers, not just applications for themselves.  The evidence supports the inference that most, if not all, of the loan officers and support staff employees would be joining Coneys and Pollicino at Superior.  A jury may determine based on this evidence, that it was the intent of Defendants to harm Plaintiff and gain a competitive advantage in this geographic region.  There are disputed issues of material fact that compel us to deny summary judgment with respect to this aspect of the unfair competition claim.

The second question we must decide is whether the evidence conclusively shows that Superior did not induce National City employees to leave their employment for the purpose of having those employees bring customer lists and customers from National City.  *Albee Homes*, 207 A.2d at 771 (stating that a claim for unfair competition may also arise if plaintiff can show that the "inducement is made for the purpose of having the employes commit wrongs, such as disclosing their former employer's trade secrets or enticing away his customers").  There are disputed issues of fact that are better left for a jury to decide with respect to this portion of the unfair competition claim against Defendants.  Superior had a policy of forbidding new hires from bringing confidential information with them to Superior.  The policy also prohibits new hires from soliciting customers from their previous employer.  Superior required new hires to sign an acknowledgment to this effect.  At the same time, Superior was calling, and sending out loan applications to, confused customers who thought they were doing business with National City.  Superior was also closing on loans that were signed by Coneys and Pollicino while Coneys and

Pollicino were still employed with Plaintiff.  Such evidence supports an inference of unfair

competition.  *See Reading Radio*, 833 A.2d at 212 (affirming denial of summary judgment on

unfair competition claim where record showed that defendants began calling customers of former

employer with the knowledge and permission of new employer).  The evidence also shows

disputed issues with respect to Pollicino and Coneys.  In the Plymouth Meeting branch, Coneys

forwarded an email from Wynne to his loan officers that described the procedure for turning in

loans to Superior before they resigned from Plaintiff.  Similarly, in Marlton, Pollicino requested

guidance from Allen on how to instruct his loan officers to submit loans with Superior before

they had resigned from National City.

    Accordingly, we will deny summary judgment on the unfair competition claim with

respect to all Defendants.

### G.    Tortious Interference with Contract Claims (Counts VI and VII)

    In Count VI, Plaintiff alleges that Superior recruited Coneys and Pollicino to join

Superior, induced Coneys and Pollicino to breach covenants in their employment agreements,

and thus tortiously interfered with those employment agreements.  (Compl. ¶ 111.)  Count VII

alleges that all Defendants recruited Plaintiff's employees to leave their employment, induced

them to breach the covenants in the employment agreements, and thus tortiously interfered with

those employment agreements.  (*Id.* at ¶ 118.)  Pollicino and Coneys argue that the claim is

barred by the economic loss doctrine and the gist of the action doctrine.[21]   Superior seeks partial

---

[21] As previously noted, application of the economic loss doctrine and the gist of the action
doctrine will be determined after the jury has had the opportunity to hear all of  the evidence.

dismissal of the tortious interference claim.[22]  Superior argues that it did not interfere with the employment agreements of former National City employees simply by offering them new employment.  Rather, as Superior contends, the National City employees left on account of their unhappiness with the reorganization that occurred in mid-2009.

In Pennsylvania, in order to prove a cause of action for tortious interference with contractual relations, plaintiff must show:  (1) the existence of a contractual relation; (2) the defendant's purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of any privilege or justification on the part of the defendant; and (4) damages resulting from the defendant's conduct.  *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 289 (Pa. Super. Ct. 2010) (quoting *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)).  In addition, the "presence of a privilege is not an affirmative defense, rather the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff."  *Bahleda v. Hankison Corp.*, 323 A.2d 121, 122-23 (Pa. Super. Ct. 1974).

To establish a claim for tortious interference with contractual relations under New Jersey law, a plaintiff must prove:  (1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damage.  *Russo v. Nagel*, 817 A.2d 426, 434 (N.J. Super. Ct. App. Div. 2003).

Similar to the claims for unfair competition, there are disputed issues of fact surrounding

---

[22] Superior does not seek summary judgment on claims related to loans allegedly diverted from Plaintiff to Superior.

Superior's intention with respect to offering employment to the National City employees. There are also disputed issues of fact with respect to Coneys' and Pollicino's role in the departure of their loan officers. The evidence shows that the loan officers left employment with Plaintiff and took employment with Superior because they were unhappy with the operational changes implemented by Plaintiff in mid-2009. Specifically, the loan officers did not favor the centralization of loan processing and underwriting functions, the decrease in commission rates and the changes in lending requirements for PHA loans. The evidence also shows, however, that Pollicino and Coneys, with the assistance of George Allen from Superior, were very much involved in the loan officers' departure from Plaintiff. Pollicino and Coneys provided Superior employment applications to the loan officers via their personal email addresses. Superior held training sessions with the loan officers while they were still employed with Plaintiff. The email Wynne sent to Coneys' customer list supports an inference that the departure was a coordinated effort among all Defendants. (*See* Pl.'s App. Ex. 94 ("We know the importance of teamwork and searched for a strong respectable lender that would accommodate our entire team.").)

Moreover, there are issues of fact that remain with respect to Superior's intentions in its acquisition of customers from Plaintiff. Superior does not dispute that certain loans were diverted from Plaintiff to Superior. Superior may be liable for tortious interference if Plaintiff can show that the hiring was for the purpose of securing Plaintiff's customers. *See Reading Radio*, 833 A.2d at 212 ("[W]hen the inducement is made for the purpose of having the employees commit wrongs such as disclosing their former employer's trade secrets or enticing away his customers, the injured employer is entitled to protection.").

Accordingly, summary judgment will be denied on the tortious interference with contract

55

claims contained in Counts VI and VII of the Complaint.

    **H.**    **Aiding and Abetting and Vicarious Liability Claims (Counts VIII and XI)**

    Plaintiff asserts an aiding and abetting claim against Superior.  "[A] person is liable for harm resulting to a third person from the conduct of another when he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ."  *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998) (quoting Restatement (Second) of Torts § 876(b)).  Plaintiff argues that "Superior assist[ed] and encourag[ed] Coneys and Pollicino, who at the time were still employed by Plaintiff, to induce Coneys' and Pollicino's subordinates to leave PNC for Superior."  (Pl.'s Mem. 85.)  As noted previously, there are disputed issues of material fact surrounding Superior's involvement in offering employment to National City employees in Marlton and Plymouth Meeting.  Moreover, there is sufficient evidence to support a finding of substantial assistance on the part of Superior.  Accordingly, we will deny summary judgment on the aiding and abetting claim.

    Plaintiff also asserts a vicarious liability claim against Superior.  An employer may be liable for the wrongful acts of its employees, including intentional torts, but only to the extent those acts were committed within the scope of employment.  To show that an employee's conduct is within the scope of employment, Plaintiff must show that (1) it is of a kind that the employee is employed to perform, (2) it occurs substantially within the authorized time and space limits; and (3) is actuated, at least in part, by a purpose to serve the employer.  *Bro-Tech*, 651 F. Supp. 2d at 419-20; *Costa v. Roxborough Memorial Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998).

    Superior's only argument in support of dismissing the vicarious liability claim is that there can be no liability when the underlying conduct at issue is not improper.  We have determined that

56

there are disputed issues of fact surrounding Defendants' conduct.  Accordingly, we will deny

summary judgment on the vicarious liability claim.

**I.       Civil Conspiracy Claim (Count X)**

Plaintiffs assert a conspiracy claim against all Defendants. A claim for civil conspiracy

requires a showing of some agreement by two or more individuals or entities to commit an

unlawful act, or to commit a lawful act by unlawful means.  *See United Aircraft Corp. v. Boreen*,

413 F.2d 694, 700 (3d Cir. 1969); *Iwanicki v. Bay State Milling Co.*, No. 11-1792, 2011 U.S. Dist.

LEXIS 140944, at *22 (D.N.J. Dec. 7, 2011) (elements of civil conspiracy include:   "(1) a

combination of two or more persons; (2) a real agreement of confederation with a common

design; (3) the existence of an unlawful purpose; and (4) proof of special damages.") (quoting

*Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir.

2003)).  Furthermore, a cause of action for civil conspiracy requires a separate underlying tort as a

predicate for liability.  *In re Orthopedic Bone Screw Prods. Liab. Lit.*, 193 F.3d 781, 789-90 & n.7

(3d Cir. 1999).  The fact that defendants act in concert or act secretly is not sufficient to make the

conduct actionable.  *Id.*

There are disputed issues of fact related to each of the underlying claims.  There are also

disputed issues of fact surrounding the role Superior played in the alleged improper conduct.

After hearing all of the evidence, a reasonable jury may find a civil conspiracy existed among

some or all of the Defendants.  Accordingly, we will deny summary judgment on the civil

conspiracy claim.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant Superior Mortgage Corporation's Motion for Partial Summary Judgment will be denied, Defendant John H. Coneys' Motion for Summary Judgment will be denied, and Defendant Marc Pollicino's Motion for Partial Summary Judgment will be denied.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**

58